UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
PATRICIA BURNELL,

                Plaintiff,

        v.

ASTATINE INVESTMENT PARTNERS,
JAMES METCALFE, and ANDREW
BISHOP,

                Defendants,
---------------------------------------------------------- X

Case No.:

**COMPLAINT**

**Jury Trial Demand**

Plaintiff Patricia Burnell ("Burnell" or "Plaintiff"), by and through her attorneys, Wigdor LLP, as and for her Complaint against Defendants Astatine Investment Partners ("Astatine" or the "Firm"), James Metcalfe ("Metcalfe") and Andrew Bishop ("Bishop") (collectively "Defendants") alleges as follows:

**PRELIMINARY STATEMENT**

1. Burnell is an extraordinary financial services professional. She earned degrees from Georgetown and Stanford University, rose through the ranks of prominent firms – eventually becoming the Chief Operating Officer ("COO") of a global business at Morgan Stanley – while also raising a family. But her superb qualifications were no match for Astatine, a private equity firm run by men.

2. Astatine, and its two male Managing Partners, Metcalfe and Bishop, refused to award Burnell carried interest, an important component of compensation at private equity firms such as Astatine, which rewards employees with an interest in the firm's investments. At first, Defendants claimed that Burnell was not eligible for carried interest because she was only a part-time employee. But even when Burnell started working full time, Defendants denied her this

compensation. All the while, they compensated the Firm's male and younger employees with carried interested, even those who were junior to Burnell and lesser performers.

3. Defendants also refused to promote Burnell beyond the position of Director – the de facto glass ceiling for women at the Firm. Virtually all senior positions at the Firm (Managing Director, Partner and Managing Partner) are – and have historically been – occupied by men. Not surprisingly, the Firm fast-tracked the careers of younger men, even when they did not necessarily meet their performance goals.

4. Burnell eventually protested the discriminatory treatment. That only made things worse. Metcalfe warned Burnell that she was "not helping herself" by complaining. Within months, Burnell's decade-long career at Astatine came to a crashing halt when Metcalfe and Bishop fired her.

5. Burnell brings this action to remedy Defendants' violations of the equal pay, anti-discrimination and anti-retaliation provisions of the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA"); the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"); the New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq*. ("NYSPEL"); and the Connecticut Equal Pay Act ("CEPA"), Conn. Gen. State. § 31-75 ("CEPA").

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.

7. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

9. Concurrent with this complaint, Plaintiff will file a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of 42 U.S.C. § 2000e *et seq*, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq*. ("ADEA").

10. Plaintiff will also file a charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging violations of Conn. Gen. Stat. § 46a-60.

11. Plaintiff will seek to amend her complaint to add Title VII, ADEA and Connecticut claims after exhausting her administrative remedies.

## PARTIES

12. Plaintiff is a former employee of Astatine who is domiciled in Bronxville, New York.

13. From the time she was hired in 2012 through approximately March 2020, Burnell worked from Astatine's offices in Connecticut. From approximately March 2020 through late 2022, Burnell worked from her home in New York. Thereafter, until her dismissal on January 5, 2023, Burnell worked in New York and Connecticut.

14. Defendant Astatine is a private equity firm. At all relevant times, Astatine was an "employer" under the applicable statutes.

15. Defendant Metcalfe is the Co-Managing Partner & Chief Executive Officer of Astatine.

16. Defendant Bishop is the Co-Managing Partner & COO of Astatine.

## FACTS

### Background

17. Burnell was born in 1968.

18. She is an extraordinarily successful financial services professional with impeccable credentials.

19. She earned her Bachelor of Science in Business Administration from Georgetown University where she graduated *magna cum laude*, and her Master of Business Administration from Stanford University.

20. She has also worked at various prestigious financial institutions, including Smith Barney, Harris Upham & Co, Credit Suisse First Boston and Morgan Stanley.

21. Among other positions, Burnell was COO for Global High Yield Capital Markets at Morgan Stanley.

22. Astatine was founded in 2005 as Alinda Capital Partners. It promotes itself as a "leading, independent, mid-market private equity firm focused on infrastructure investments."

23. It purports to have $10 billion in assets under management and hundreds of institutional investors across North America, Europe, the Middle East and Asia Pacific.

24. Unfortunately, like many financial services firms, it is male dominated. Men are rewarded with elevated titles and higher pay even when they underperform. Women, regardless of their skills and achievements, are sidelined.

25. For instance, men dominate the Firm's executive suite. Both of the Firm's Managing Partners, Metcalfe and Bishop, are men. All five Partners, including the Managing Partners, are also men. Three Managing Directors are men. (Only one is a woman.) In other words, eight of the top nine positions at the Firm are occupied by men.

26. Unsurprisingly, women outnumber men at the Firm's lower levels. Nine of the Firm's remaining 13 employees from Director and below are women. Both of Astatine's administrative assistants are women.

27. Astatine treats men and women differently even when they occupy the same position. For example, the Firm gave its former Chief Financial Officer ("CFO") – a man – the title of Managing Director, which is common in the industry. In or about 2017, the CFO position was given to a woman. Astatine promptly downgraded the position to Director and, in all likelihood, paid the female CFO less than her male predecessor.

### Burnell's Work at Astatine

28. Burnell began her career at Astatine in November 2012.

29. After taking time off to raise her children, Astatine hired Burnell as a Vice President ("VP") in the Portfolio Management Division working part time.

30. Burnell performed well, consistently earning positive performance reviews and increasing responsibilities.

31. In 2016, Astatine launched a new investment fund - Fund III.[1]

32. The Firm awarded carried interest[2] in Fund III to Burnell's male and younger peers, including, Felipe Diaz ("Diaz") (30s), Cory Scheuerle ("Scheurle") (30s), and Jason Levy ("Levy") (30s).

33. It did not, however, award Burnell any carried interest despite her repeated requests.

---

[1]   Private equity firms like Astatine operate by launching funds that, in turn, make investments. When an individual investment in the fund is sold and earns a profit, the firm pays out the fund's investors.

[2]   Carried interest is a form of compensation awarded in addition to salary and bonus that gives an employee a percentage interest in the fund. When an investment in the fund is sold, all fund participants earn a payout.

34. At the time, the Firm contended that Burnell was not eligible for carried interest because she was only a part-time employee.

35. Nonetheless, Burnell continued to work hard and, in 2018, became a full-time employee, earning a promotion to Director - typically the highest position available to women at Astatine.

36. As a Director, Burnell had important responsibilities across the Firm, including within the Global Investments ("GI") division run by Metcalfe and the Investor Solutions & Administration ("ISA") division run by Bishop.

37. For instance, Burnell was the Chief of Staff for GI.

38. In that role, Burnell was responsible for staffing junior resources, conducting recruiting efforts and training and mentoring junior employees.

39. She was also responsible for internal and external reporting at the fund and portfolio company level, including overseeing the quarterly valuation process for all portfolio assets and funds.

40. In addition, she managed the asset valuation processes with outside valuation experts, the annual audit of all portfolio asset valuation and conducted extensive due diligence for all portfolio companies across all funds.

41. These tasks required extensive financial analysis and were substantially similar to the work performed by Scheuerli, Levy, Christopher Reid ("Reid") (30s) and Dado Slezak ("Slezak") (40s).

42. Burnell was also responsible for investor relations across the Firm. This included responsibility for investor reporting requirements, providing qualitative and quantitative information for private placement memoranda, income trust prospectuses and due diligence questionnaires.

43. These tasks were substantially similar to those performed by Scheuerle, Levy, Reid and Slezak.

44. And, while not formally a member of the Finance Team, Burnell assumed many tasks performed by the team, including financial analysis at both the asset and fund levels.

45. These tasks were also similar to those performed by Scheuerle, Levy, Reid and Slezak.

46. In 2018, Burnell also became Head of Environmental, Social and Governance ("ESG") within ISA. In this role, Burnell developed the Firm's ESG policies and procedures, completed an annual ESG Risk Review and Compliance process, and conducted mandatory training.

47. Astatine featured Burnell's ESG work on its website, including a separate microsite showcasing Burnell's initiative.

48. Burnell also managed the annual GRESB (formerly the Global Real Estate Sustainability Benchmark) assessment submission process for all funds and underlying assets. (This often included over 20 entities.) The process was time intensive, but Burnell managed it in addition to her other responsibilities because ESG and the GRESB were high priorities for the Firm.[3]

## Defendants Continue to Deny Burnell Equal Compensation

49. Although Burnell was now a full-time employee with high-level responsibilities, Defendants continued to deny her carried interest despite her annual requests.

---

[3] Burnell was eventually recognized throughout the industry for her expertise. She was selected as one of 13 board members worldwide for GRESB's Infrastructure Standards Committee.

50. By contrast, the Firm granted carried interest to many male and younger employees who were junior to Burnell, including Diaz, Scheuerle and Levy.[4]

51. Even after Burnell became a member of the Firm's Operating Committee in or about mid-2017, Astatine continued to deny her carried interest.

52. Almost all other members of the Operating Committee were men. And all were compensated with carried interest.[5]

53. As Burnell's responsibilities and importance to the Firm grew, Burnell continued to request that the Firm compensate her with carried interest as it did for her male and younger colleagues. Astatine persistently refused.

54. At one point, Defendants claimed that Burnell could not be awarded carried interest in Fund III because she did not work on the fund. Not only was this not true (Burnell helped launch Fund III), but Defendants awarded carried interest to employees regardless of whether they were involved in a particular fund.

55. In or about April 2021, Astatine launched Fund IV.

56. As with Fund III, Burnell helped launch the new fund.

57. Once again, the Firm did not grant Burnell carried interest at the time, while it granted such compensation to her male and younger colleagues.

58. Finally, in April 2022, Astatine, for the first time, granted Burnell carried interest in Fund IV.

---

[4] Upon information and belief, the Firm only denied carried interest to one associate hired in 2022 who, like Burnell, is a woman.

[5] There was one other female member of the Operating Committee. She was likely awarded carried interest. But, upon information and belief, she is 20 years younger than Burnell.

**Defendants Deny Burnell a Promotion**

59. As of 2022, Astatine had five Directors in GI reporting to Metcalfe - three men and two women, including Burnell.

60. In or about April 2022, Defendants promoted all three men to Managing Director.

61. The Firm denied promotions to both women, including Burnell.

62. This was part of the Firm's continuing pattern of supercharging the careers of younger men.

63. For example, Defendants promoted Reid, a man in his 30s who graduated from college in 2010. Prior to joining Astatine, Reid had only held one entry-level full-time job as an Analyst at a financial services firm for less than two years. Defendants nonetheless hired Reid in March 2012 as a Director, permitting him to bypass the Associate and VP positions, as is typically required of Astatine's female employees.

64. By contrast, in 2010 (the year Reid graduated), Burnell had already earned her master's from Stanford (Reid does not have a graduate degree) and had experience operating a global business for Morgan Stanley, one of the largest financial institutions in the world. In 2012, (the year Defendants hired Reid as a Director) Burnell was hired as only a VP (one level below Reid) despite her superior experience and qualifications.

65. Defendants also promoted Levy, a man in his 30s who graduated from college in 2007. While Defendants did not permit Levy to bypass lower-level positions, they nonetheless fast-tracked his career by promoting him every few years. For instance, Levy was a VP for only two years and eight months before being promoted to Director. He was promoted again to Managing Director after only two years.

66. By contrast and despite her far superior qualifications, Burnell spent six years as a VP before being promoted to Director.

67. Defendants did not permit her to advance beyond that title, as has been the case with almost all women at Astatine.

68. The disparate treatment was not based on performance. Burnell always earned excellent reviews and merit bonuses. One of the Firm's founders praised Burnell for having "great ability," and being a "doer and a leader who makes organizations run better." He further described Burnell as "intelligent, hardworking and a leader" who "gets result."

69. Burnell's younger, male counterparts have been less than stellar at their jobs. Over the last few years, Reid and Levy have been unable to source new transactions, despite that being a critical part of their jobs.

## The Firm's Sexist Environment

70. This was not the first time Astatine overlooked Burnell's accomplishment in favor of men. For instance, after Burnell became Head of ESG, the Firm planned to issue a press release touting a successful ESG result by one of its portfolio companies. Burnell requested that she be quoted in the press release because she worked on the project and was the Head of ESG. The Firm refused, telling Burnell that the quote would be "better coming from a man."

71. Nor was this the first time the Firm, through its actions, signaled its sexist view of women. For instance, in or about 2019, the Firm held an investor conference in Cannes, France. Bishop flew two women in their 20s to the event under the pretense that they were Pilates instructors. In fact, they did not conduct any Pilates classes for investors. Rather, they spent most of their time at cocktail hours and dinners on behalf of the Firm. They became the target of attention of many of the men who attended. At one point, one of the women mentioned that she had not been to Monaco. Bishop promptly arranged for a car to take the two women sightseeing in Monaco.

**Burnell Protests Discrimination**

72. In or about mid-2022, Burnell protested to Metcalfe that she had been overlooked for promotion to Managing Director while men were promoted.

73. Rather than take corrective action, or even investigate Burnell's claims, Metcalfe lashed out at Burnell, warning her that, by speaking up, she was "not helping [her]self."

**Defendants Fire Burnell**

74. Within months, Burnell's decade-long career at Astatine came to a crashing halt.

75. On January 5, 2023, Metcalfe and Bishop fired Burnell.

76. They claimed that the Firm was restructuring and that Burnell's position had been eliminated.

77. Defendants' explanation for dismissing Burnell was clearly pretextual as Astatine transferred the bulk of Burnell's responsibilities to a male Managing Director.

78. Further, Astatine has made clear that the ESG and GRESB processes, which were among Burnell's responsibilities, were high priorities for the Firm. Astatine's website prominently featured the Firm's ESG practices and commitments to completing the GRESB process, headed by Burnell, through at least 2026.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of the EPA)**

79. Plaintiff repeats, reiterates and re-alleges each and every allegation above in the preceding paragraphs, as though set forth fully herein.

80. By the acts and practices described above, Defendants violated the EPA by paying male employees higher wages for substantially equal work in a job which required equal skill, effort and responsibility and which was performed under similar working conditions.

81. Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

82. Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
**(Discrimination and Retaliation in Violation of the NYSHRL)**

83. Plaintiff repeats, reiterates and re-alleges each and every allegation above in the preceding paragraphs, as though set forth fully herein.

84. By the acts described above, Defendants discriminated and retaliated against Plaintiff in the terms and conditions of her employment in violation of the NYSHRL.

85. Defendants' conduct was willful, and they knew that their actions were unlawful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

86. Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
**(Discrimination in violation of the NYSPEL)**

87. Plaintiff repeats, reiterates and re-alleges each and every allegation above in the preceding paragraphs, as though set forth fully herein.

88. By the acts and practices described above, Defendants violated the NYSPEL by paying male and younger employees higher wages for substantially similar work based on a composite of skill, effort and responsibility, and which was performed under similar working conditions.

89. Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

90. Plaintiff has suffered and will continue to suffer damages as a result of Defendants' willful and unlawful conduct unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
(Discrimination in violation of the CEPA)

91. Plaintiff repeats, reiterates and re-alleges each and every allegation above in the preceding paragraphs, as though set forth fully herein.

92. By the acts and practices described above, Defendants violated the CEPA by paying male employees higher wages than Plaintiff for substantially similar work based on a composite of skill, effort and responsibility, and which was performed under similar working conditions.

93. Defendants' conduct was willful, and they knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

94. Plaintiff has suffered and will continue to suffer damages as a result of Defendant's willful and unlawful conduct unless and until this Court grants relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a Judgment:

A. declaring the acts and practices complained of herein to be violations of the EPA, NYSPEL, NYSHRL and CEPA;

B. enjoining and permanently restraining these violations;

   C. directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' unlawful treatment of her, and making her whole for all earning and other benefits she would have received but for Defendant's unlawful treatment, including but not limited to wages, including back pay and front pay, carried interest, bonuses and other lost benefits;

   D. directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

   E. directing Defendants to pay Plaintiff liquidated damages;

   F. directing Defendants to pay Plaintiff compensatory damages including damages for emotional distress, humiliation, pain and suffering and injury to professional standing and reputation;

   G. directing Defendants to pay Plaintiff additional amounts as punitive damages;

   H. awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

   I. awarding Plaintiff the costs of this action, together with reasonable attorneys' fees; and,

   J. awarding such other and further relief as this Court deems necessary and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury in this action.

Dated: August 1st, 2023
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      Valdi Licul

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com